# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

ADAM A. LOCKE,

                Plaintiff,

v.

AUSTIN RITTER, STEPHANIE DUCKETT, DR. ADEMI FATOKI, and DODGE COUNTY,

                Defendants.

Case No. 14-CV-1143-JPS

ORDER

      In this action under 42 U.S.C. § 1983, Plaintiff Adam A. Locke, ("Locke") a state prisoner, claims the defendants violated his due process rights by acting with deliberate indifference to a serious medical need. Presently before the Court are two separate motions, including: (1) Defendant Stephanie Duckett's ("Nurse Duckett"), Defendant Dr. Ademi Fatoki's ("Dr. Fatoki") and Austin Ritter's ("Nurse Ritter") motion for summary judgment (Docket #83); and (2) Defendant Dodge County's motion for summary judgment (Docket #75).[1] For the reasons detailed herein, both of the motions for summary judgment will be granted and this action will be dismissed in its entirety. The Court now turns to discuss the factual background of the case.

1.     FACTUAL BACKGROUND

      The facts of this case are fairly simple. In short, Locke alleges that the defendants violated his Eighth Amendment rights by failing to provide

---

[1]In order to clarify the record, the Court notes that Locke voluntarily dismissed Defendant Brent Oleson from this action when he filed his amended complaint on February 10, 2015, and did not allege any claims against Defendant Oleson. (*See* Docket #39).

proper medical care after Locke allegedly swallowed a metal object in his food.

1.1  The Parties

Locke was an inmate at the Dodge County Jail from April 4, 2014, to July 31, 2014. (Docket #84 ¶ 3). Defendants Ritter and Duckett are licensed nurses in the state of Wisconsin; Defendant Dr. Fatoki is a licensed physician in the state of Wisconsin. All three of their licenses were in effect throughout July of 2014. (Docket #84 ¶ 8). Throughout July of 2014, Nurses Ritter, Duckett and Dr. Fatoki were employed by Correctional Healthcare Companies ("CHC") to provide on-site healthcare to the inmates of the Dodge County Jail. (Docket #84 ¶ 9).

In their role as licensed healthcare providers at the Dodge County Jail Health Services Unit ("HSU"), Nurses Ritter, Duckett, and Dr. Fatoki had access to inmate medical records and charts, including progress notes, problem oriented records, written inmate requests for medical care ("Medical Slip"), and medical administration records ("MAR"), and they have reviewed those documents for Locke as they pertain to this matter. (Docket #84 ¶ 10).

1.2  Dodge County Jail Medical Policies[2]

When inmates enter Dodge County Jail, they are informed that if they require non-emergency medical attention, they are required to submit a written Medical Slip to HSU. (Docket #84 ¶ 11). During Locke's booking, he acknowledged receipt of the Jail Rules and that he understood how to obtain medical care while in custody. (Docket #81 ¶ 13).

---

[2]The Court notes that Locke disputes the written jail medical policies. However, Locke has failed to establish personal knowledge or produce any evidence of the jail policies and fails to create a genuine issue of fact. *See* Fed. R. Civ. P. 56(c)(1).

During Locke's incarceration, Dodge County provided inmates with medical care through a contract with CHC. (Docket #81 ¶ 11). In 2014, CHC and the nurses and medical providers it contracted with were independent contractors and not employees of Dodge County. (Docket #81 ¶ 11). If an inmate at Dodge County is in need of non-emergency care, he would make a request for medical care. Any medical request made by an inmate would be evaluated by the nursing staff. (Docket #81 ¶¶ 14, 30). Unless it is an emergency situation requiring immediate medical attention, jail officers or supervisors would have no involvement in the evaluation of an inmate's request for medical care. The jail nurses and/or the physician would determine what course of action was necessary, including whether the inmate should be examined by a nurse or physician. (Docket #81 ¶¶ 15, 30).

Under Dodge County policies, an inmate who would like medical attention would submit a request for medical attention. (Docket #81 ¶¶ 14, 30). Under these policies, both jail supervisors and medical personnel have the authority to transfer an inmate to the emergency room if warranted. (Docket #81 ¶¶ 17, 33). In particular, Policy 240.10 provides for the procedure for inmates to access medical care. It also provides that in the absence of medical staff, Dodge County Detention supervisors have the authority to arrange for any immediate and necessary medical care. It states:

> 5. Medical staff will require requests for sick call by scheduling a "Med Appt/Nurse in House" event in the RMS.
>
>    a. DCDF Supervisors will, in the absence of medical staff, determine if any health care requests require immediate attention and arrange for any necessary health care.

(Docket #81 ¶ 30). Policy 240.05A3h provides as follows:

> Medical staff/Shift Commander will determine need for transportation of inmate to Beaver Dam Community Hospital and will notify Mater Control to contract Dodge County Sheriff's Office Communications of the need for an ambulance.

(Docket #81 ¶ 31). Policy 220.06 (7) Emergency Response Provides as follows:

> 7. Medical staff and/or health-trained staff will begin triage upon their arrival. Health-trained staff will defer authority upon arrival of medical staff.
>
>    a. Triage assistance will be available through the medical department.
>
>    b. First-aid procedures will be applied as needed.
>
>    c. Ambulance will transport designated individuals to Beaver Dam Community Hospital per Policy 220.02 Inmate Movement and Policy 240.05 Medical Emergencies. Contract inmates will be escorted.
>
>    …
>
> 9. When applicable, the Shift Commander will notify the contracting agency within 2 hours, when an inmate is transported to the hospital, and will document notification in RMS.

(Docket #81 ¶ 32). In sum, under the written policy, both the jail and medical personnel had the power and authority to transport any inmate to the emergency room, if warranted. (Docket #81 ¶¶ 17, 30-33)

    1.3    July 17, 2014 Incident and Locke's Treatment

On July 17, 2014, at approximately 12:30 p.m., Locke allegedly swallowed a piece of metal while consuming his lunch. Nurse Ritter was working in his capacity as a registered nurse at the Dodge County Jail. Nurse Ritter was summoned by a guard to assist Locke. Locke told Nurse Ritter that he had believed he swallowed a metal object and had felt it in his mouth

prior to swallowing. (Docket #84 ¶ 15). Nurse Ritter assessed Locke and took Locke's vital signs, which were stable and within normal limits. (Docket #84 ¶ 16).[3] Nurse Ritter also visually inspected Locke's mouth and throat, and saw no evidence of a foreign object or irritation. (Docket #84 at 18).[4] Nurse Ritter observed that Locke was not spitting or coughing blood, vomiting, retching, or dry heaving. (Ritter Decl. ¶ 18). Locke alleges that he was gagging in front of Nurse Ritter. (Locke Decl. at 21, Docket #102 at 8). Nurse Ritter's medical notes indicate that he believed it was possible that Locke had swallowed a foreign object, but also possible that he could have swallowed an air bubble. (Docket #86-1 at 10).

Locke felt that he could not breath and immediately requested to go to an emergency room and to obtain an x-ray. (Locke Decl. at 3, Docket #95). Based upon his education and experience, Nurse Ritter knew that swallowed foreign objects typically pass through the digestive system uneventfully. (Ritter Decl. ¶ 20). As such, Nurse Ritter's assessment of Locke concluded that he was not experiencing a medical emergency. (Ritter Decl. ¶ 21). Locke maintains that Nurse Ritter said Locke could not go to the hospital because only a doctor had the authority to send an inmate to the hospital and that no doctor was available. (Locke Decl. at 3, Docket #95).

---

[3] Locke disputes that his vital signs were within normal limits.

[4] Locke disputes this contention and argues that Nurse Ritter "could not have visually inspected [his] throat without the proper medical equipment." (Docket #97 at 8). However, Locke is not a trained medical professional and has provided nothing in the record to establish this fact. As such, Locke's contention fails to establish a genuine dispute of fact. *See* Fed. R. Civ. P. 56(c)(1).

Locke got up and walked out of the room under his own power, which reaffirmed Nurse Ritter's belief that there was no medical emergency. (Ritter Decl. ¶ 21). Nurse Ritter placed Locke on the doctor's list and later, on July 17, 2014, wrote that Locke could request Tylenol as needed. (Docket #86-1 at 11).

At approximately 3:00 a.m. on July 18, 2014, Locke was evaluated by Nurse Merrietta Brady (who is not a defendant in this action). (Docket #82 ¶ 24). Nurse Brady provided Locke a one-time dose of Tylenol and liquid antacid. She instructed him to continue drinking fluids and to contact the medical department if his symptoms persisted or worsened. (Docket #84 ¶ 27).

In the early afternoon of July 18, 2014, Nurse Duckett was performing afternoon "med-pass." (Duckett Dec. ¶ 13). "Med-pass" is the dispensation of prescription medications to inmates; it requires a nurse's full attention to avoid medication errors. (Duckett Dec. ¶ 13). Prescription medication cannot be left unattended during "med-pass." (Docket #81 ¶ 28). At this time, Locke did not have any prescribed medications at the time, and he had no legitimate reason to stand in the "med-pass" line. Dodge County Jail policies state, "You may request over the counter medications using the medication request slips provided in your housing area. All requests for over-the counter medication must be submitted to the Pod Officer on duty PRIOR to nurse's arrival on Pod for medication distribution." (Docket #79-1 at 16).

When Locke reached the front of the med-pass line, he requested medication and to be assessed. At this time, Nurse Duckett knew that Locke had claimed he swallowed a foreign object, and that he had been assessed by Nurse Ritter the day before and by Nurse Brady earlier that day. Nurse Duckett told Locke that if he wished to be seen by a nurse, he was required

to submit a medical slip, per jail policy. (Docket #84 ¶ 31). In Nurse Duckett's professional opinion, Locke was not experiencing an emergent medical situation that would require urgent medical attention. (Docket #84 ¶ 32). Locke made an additional medical request later that day. ((Docket #84 ¶ 33).

On July 19, 2014, Locke was again assessed by medical staff. (Ritter Dec. ¶ 29). Locke had reported that he had passed an object in a bowel movement, which appeared to be a small portion of a metal drill bit. Locke's vital signs were again taken and the fact that he had no complaints of pain or bleeding was noted. (Docket #84 ¶ 34). Between July 19 and July 23, 2014, Locke made no written medical requests.

On July 24, 2014, Dr. Fatoki and Nurse Ritter examined Locke. Locke's vital signs were again normal and he did not appear to be in distress. (Fatoki Decl. ¶ 13). Dr. Fatoki noted that Locke was eating well and that he was experiencing only a little gas and a stomach ache off and on. (Docket #84 ¶ 36). Locke maintains that he was still in physical distress and required an x-ray and emergency treatment at this time. (Docket #97 at 19).

On July 28, 2014, Locke submitted another medical request form. In it, he complained of stomach pain and cramps.(Docket #84 ¶ 38). Although Locke contends Nurse Ritter or Dr. Fatoki never saw him on July 28, 2014, Locke's medical charts refute this assertion. (Docket #88-1 at 21-22). Locke reported he had been having abdominal pain/cramping and diarrhea for three days. Nurse Ritter assessed Locke and his vital signs were stable. Nurse Ritter then shared his assessment with Dr. Fatoki, who ordered Locke placed on observation status. (Docket #88-1 at 21-22). Nurse Ritter also provided Locke with Loperamide, a medication for diarrhea. Further, Nurse Ritter offered Locke Tylenol, which Locke refused. (Docket #88-1 at 21).

On July 30, 2014, Nurse Ritter assessed Locke again. Locke's medical records indicate that he was feeling a "little better," and that Locke did not have a fever and there was no evidence of diarrhea or other physical issues. (Docket #88-1 at 21-22). On July 31, 2014, Locke was transported out of the Dodge County Jail. (Docket #84 ¶ 42).

2.     LEGAL STANDARD

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986); *Ames v. Home Depot U.S.A., Inc.*, 629 F.3d 665, 668 (7th Cir. 2011). "Material facts" are those under the applicable substantive law that "might affect the outcome of the suit." *See Anderson*, 477 U.S. at 248. A dispute over "material fact" is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

A party asserting that a fact cannot be or is genuinely disputed must support the assertion by: "(A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1). "An affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(4).

3.   DISCUSSION

Nurse Ritter's, Nurse Duckett's, and Dr. Fatoki's motion for summary judgment argues that the undisputed facts establish that they were not deliberately indifferent to Locke's medical condition because they provided prompt and reasonable care. Dodge County's motion for summary judgment argues that: (1) there is no evidence of an unconstitutional policy or procedure which was causal of Locke's injuries; and (2) that Locke failed to exhaust his administrative remedies prior to filing suit. As discussed below, the Court finds that Nurse Ritter, Nurse Duckett, and Dr. Fatoki are entitled to summary judgment because they did not violate Locke's Eighth Amendment rights as a matter of law. Additionally, because there is no underlying constitutional claim, Dodge County is entitled to summary judgment as well.

3.1   Legal Standard—Deliberate Indifference

Locke alleges that Nurse Ritter, Nurse Duckett, and Dr. Fatoki acted with deliberate indifference to his medical needs in violation of the Eighth Amendment. *See Estelle v. Gamble*, 429 U.S. 97, 104-06 (1976) (holding that deliberate indifference to the serious medical needs of a prisoner may serve as the basis for a § 1983 claim). "The Eighth Amendment, applicable to the states through the Due Process Clause of the Fourteenth Amendment, protects prisoners from prison conditions that cause the 'wanton and unnecessary infliction of pain,' including…grossly inadequate medical care." *Pyles v. Fahim*, 771 F.3d 403, 408 (7th Cir. 2014) (quoting *Rhodes v. Chapman*, 452 U.S. 337, 348 (1981)) (internal citations omitted). The prisoner has the burden "to demonstrate that prison officials violated the Eighth Amendment, and that burden is a heavy one." *Id.* (citing *Whitley v. Albers*, 475 U.S. 312, 325 (1986)).

To prove a claim of deliberate indifference to serious medical need, Locke must show: (1) an objectively serious medical condition; (2) that the defendants knew of the condition and were deliberately indifferent in treating Locke ; and (3) this indifference caused Locke some injury. *Gayton v. McCoy*, 593 F.3d 610, 620 (7th Cir. 2010). Defendants argue that Locke cannot meet the second element (the subjective state-of-mind requirement) because none of the defendants were deliberately indifferent to his medical condition. (Docket #109 at 2).

The deliberate indifference inquiry has two components. "The official must have subjective knowledge of the risk to the inmate's health, and the official also must disregard that risk." *Gayton*, 593 F.3d at 620. Even if an official is aware of the risk to the inmate's health, "he is free from liability if he 'responded reasonably to the risk, even if the harm ultimately was not averted.'" *Id.* (quoting *Farmer v. Brennan*, 511 U.S. 825, 843 (1994)). Negligence cannot support a claim of deliberate indifference; nor is medical malpractice a constitutional violation. *Estelle*, 429 U.S. at 105-06; *Roe v. Elyea*, 631 F.3d 843, 857 (7th Cir. 2011); *Barry v. Peterman*, 604 F.3d 435, 441 (7th Cir. 2010). The official must act with "a sufficiently culpable state of mind." *Walker v. Benjamin*, 293 F.3d 1030, 1037 (7th Cir. 2002).

When it comes to medical care in the prison setting, "prisoner[s] [are] not entitled to receive 'unqualified access to healthcare,'" *Holloway v. Delaware Cnty. Sheriff*, 700 F.3d 1063, 1073 (7th Cir. 2012) (quoting *Hudson v. McMillian,* 503 U.S. 1, 9 (1992)); instead, "prisoners are entitled only to 'adequate medical care,'" *id.* (quoting *Johnson*, 433 F.3d at 1013)). Adequate medical care may involve care that the prisoner disagrees with; this disagreement alone is insufficient to establish an Eighth Amendment violation. *See Pyles*, 771 F.3d at 409. To establish deliberate indifference, the

prisoner must demonstrate "that the treatment he received was 'blatantly inappropriate,'" *id.* (quoting *Greeno v. Daley*, 414 F.3d 645, 654 (7th Cir. 2005)); or, stated another way, that the treatment decision "represents so significant a departure from accepted professional standards or practices that it calls into question whether the [medical professional] was actually exercising his professional judgment," *id.* (citing *Roe v. Elyea*, 631 F.3d 843, 857 (7th Cir. 2011) and *Sain v. Wood*, 512 F.3d 886, 895 (7th Cir. 2008)); *Gayton*, 593 F.3d at 622-23.

If the plaintiff fails to provide enough evidence to show deliberate indifference, and it cannot be inferred from the medical professional's treatment, "the deliberate indifference question may not go to the jury." *Gayton*, 593 F.3d at 620, 623.

### 3.2 Analysis

The Court finds as a matter of law that the defendants did not violate the plaintiff's Eighth Amendment rights. The parties do not quarrel over whether Locke suffered from a serious medical condition; the dispute instead concerns whether the defendants' refusal to send Locke to a hospital or order further testing permits an inference that they possessed the mental culpability required to be liable under the Eighth Amendment.

Here, the Court finds that Locke has failed to present evidence that the individual defendants were deliberately indifferent to his medical needs. In their statement of facts, the defendants set out in detail the medical care that Locke received at Dodge County Jail during the relevant time period from July 17, 2014, to July 31, 2014. During this time, Locke was assessed three times over the two days between when he claims he swallowed the object and when he claims he passed it (Docket #84 ¶ 43), and at least six times between July 17 and July 31, 2014. (Docket #84 ¶ 44). Because Locke alleges

that each defendant was deliberately indifferent to his medical condition, the Court will describe separately Locke's interactions with each medical provider and analyze them in turn.

### 3.2.1 Defendant Ritter

Nurse Ritter argues that he is entitled to summary judgment because there is no evidence in the record showing that he was deliberately indifferent to Locke's medical needs. In turn, Locke argues that Nurse Ritter was deliberately indifferent because his chosen course of treatment was not based on sound medical judgment, as required by the Eighth Amendment (Docket #112 at 9). Locke maintains, *inter alia,* that his vital signs were not within normal limits when Nurse Ritter first saw him on July 17, 2014, and that Locke required emergency care and further treatment. (Docket #97 at 6-7).

Locke admits that Nurse Ritter assessed him immediately following the initial incident on July 17, 2014. (Locke Decl., Docket #98 ¶ 9). Locke's allegations against Nurse Ritter can be summed up as a disagreement in the course of proper treatment. Whether to send a patient to the emergency room or whether to order specific tests or treatment, such as an x-ray, is inarguably an exercise of medical judgment, which is presumptively valid. *Estate of Cole by Pardue v. Fromm*, 94 F.3d 254, 262 (7th Cir. 1996). The Court finds that Nurse Ritter is entitled to summary judgment because there is no evidence in the record which suggests that he was deliberately indifferent to Locke's medical needs; Locke has failed to meet his "heavy" burden to prove an Eighth Amendment violation. *See Pyles*, 771 F.3d at 408.

Locke's argument centers around Nurse Ritter's assessment of his vital signs. Locke maintains that his recorded vital signs show that he required emergency medical care; Locke relies heavily on an "expert report" written

by his sister, Laticia Locke, a registered nurse. (*See* Docket #100). Ms. Locke maintains that her brother's vital signs were unstable and prove that he required emergency medical treatment. For example, Ms. Locke references the plaintiff's blood pressure as indicated in the plaintiff's medical records, which was 162/82 following the July 17, 2014 incident. (Docket #100 at 2). Ms. Lock states that, in accordance with the American Heart Association's ("AHA") guidelines, the normal blood pressure for an adult is 119/79 and that a blood pressure of 140/90 or higher is considered a high blood pressure. (Docket #100 at 2). Ms. Locke further indicates in her report that she drew upon the AHA's guidelines as well as her own ten years of nursing experience in reaching this conclusion. (Docket #100 at 2).[5] The plaintiff maintains that this factual dispute over his vital signs precludes summary judgment. The Court, however, disagrees.

At first blush, Locke's argument may suggest that material issues of fact exist to preclude summary judgment. However, even assuming Locke's version of the facts—that his vital signs did objectively suggest that he required emergency care—this scenario is at worst medical malpractice, which does not support a claim for deliberate indifference. *Estelle,* 429 U.S. at 105-06; *Roe,* 631 F.3d at 857. The undisputed facts show that Nurse Ritter assessed Locke and took his vital signs almost immediately after the incident occurred. Locke maintains that Nurse Ritter did not believe that he swallowed a piece of metal and instead swallowed an air bubble. However, even if Nurse Ritter did misinterpret Locke's vital signs and treat him based on that misinterpretation for acid reflex, gas, and swallowing an air bubble

---

[5]The Court notes that it is not clear on what specific AHA guidelines Locke and his expert rely, as they do not use citations to support their assertions nor do they include any attached AHA guidelines in their filings.

(as Locke alleges), the Court cannot say that the treatment decision "represents so significant a departure from accepted professional standards or practices that it calls into question whether the [medical professional] was actually exercising his professional judgment" *See Pyles,* 771 F.3d at 409. The Court recognizes that Nurse Ritter's assessment and treatment of Locke may not have addressed his concerns and may not have been what he wanted; indeed, the Court can certainly understand Locke's concern given his belief that he swallowed a metal object. However, there is simply nothing in the record to suggest that Nurse Ritter acted with "a sufficiently culpable state of mind" to state a claim for deliberate indifference. *See Walker,* 293 F.3d at 1037.

Finally, although not necessary in reaching its conclusion, the Court also notes that it has doubts regarding the conclusions drawn from Locke's expert and the AHA guidelines. The Court is not in the business of questioning experts' conclusions; however, as noted recently by Judge Posner, [w]hen medical information can be gleaned from the websites of highly reputable medical centers, it is not imperative that it instead be presented by a testifying witness." *Rowe v. Gibson,* –F.3ed– , 14–3316, 2015 WL 4934970 at *7 (7th Cir. August 19, 2015). Locke contends that AHA guidelines establish a material issue of fact that precludes summary judgment.

A review of the AHA's website, a well-known and reputable medical center, suggests only blood pressure reading of 180/110 requires emergency medical treatment for a hypertensive crisis. Understanding Blood Pressure Readings, heart.org, http://www.heart.org/HEARTORG/Conditions/High BloodPressure/AboutHighBloodPressure/Understanding-Blood-Pressure-Readings_UCM_301764_Article.jsp. Here, Locke's blood pressure

Page 14 of 19

Case 2:14-cv-01143-JPS   Filed 09/29/15   Page 14 of 19   Document 118

was 162/82, which does not fall within or even close to the suggested guidelines for emergent care. Moreover, the expert report provides no information regarding the status of Locke's normal blood pressure, which, as the defendants point out in their reply brief, upon admittance to the jail in April 2014 was already above average at 148/90. (*See* Docket #109 at 4). Nor does the report discuss other relevant factors in assessing blood pressure, such as the fact that Locke is overweight, had just finished eating, and is African-American (Docket #86-1 at 3 and Ritter Supp. Decl. ¶ 5), all risk factors of high blood pressure. As a pro se plaintiff, the Court construes Locke's filings liberally; however, the evidence before the Court simply does not create a material issue of genuine fact to preclude summary judgment.

As such, the Court finds that no reasonable jury could find that Nurse Ritter's actions constituted deliberate indifference to Locke's serious medical need. Accordingly, the Court will grant Nurse Ritter's motion for summary judgment.

### 3.2.2 Defendant Duckett

Here, the Court finds that Nurse Duckett is entitled to summary judgment because there is no evidence in the record which suggests that she was deliberately indifferent to Locke's medical needs. Locke's claim against Nurse Duckett appears to center around the concept that Locke believes he was entitled to immediate medical assistance the moment he requested it from Nurse Duckett on July 18, 2014. This standard of care, however, does not come close to what the Eighth Amendment requires. Indeed, "prisoner[s] [are] not entitled to receive 'unqualified access to healthcare,'" *Holloway v. Delaware Cnty. Sheriff*, 700 F.3d 1063, 1073 (7th Cir. 2012) (quoting *Hudson v. McMillian*, 503 U.S. 1, 9 (1992)).

The undisputed facts show that Nurse Duckett was distributing medications when Locke approached her for assistance. At this time, Locke did not have any prescribed medications at the time, and he had no legitimate reason to stand in the "med-pass" line. When Locke reached the front of the med-pass line, he requested medication and to be assessed. At this time, Nurse Duckett knew that Locke had claimed he swallowed a foreign object, and that he had been assessed by Nurse Ritter the day before and by Nurse Brady earlier that day.

The Court finds that Nurse Duckett's decision not to abandon her "med-pass" duties and medication cart to examine Locke, who had not submitted a written request, exhibited no signs of being in medical distress, and had already been examined twice in the past 24 hours, was entirely reasonable. Indeed, as the defendants point out in their brief, had Nurse Duckett abandoned her medical cart full of prescriptions in a room full of prisoners, one can imagine a different lawsuit altogether against her. (Docket #85 at 14). The Eighth Amendment does not require perfect decision making, and the Court is mindful of the difficult decisions that healthcare providers make each day. Nurse Duckett made a medical judgment that Locke was not experiencing a medical emergency and did not require immediate treatment. The fact that Locke disagreed with that medical judgment is insufficient to meet the standard for medical deliberate indifference. *See Pyles*, 771 F.3d at 409.

As such, the Court finds that no reasonable jury could find that Nurse Duckett's actions constituted deliberate indifference to Locke's serious medical need. Accordingly, the Court will grant Nurse Duckett's motion for summary judgment.

### 3.2.3 Defendant Dr. Fatoki

Here, the Court finds that Dr. Fatoki is entitled to summary judgment because there is no evidence in the record which suggests that he was deliberately indifferent to Locke's medical needs. Dr. Fatoki first became involved in Lock's medical treatment on July 24, 2014—seven days after the initial incident and four days after Locke allegedly passed the metal object in a bowel movement. Locke's claim against Dr. Fatoki can be summed up as a difference of opinion in the course of medical treatment—which is insufficient to state an Eighth Amendment claim. *See Pyles*, 771 F.3d at 409. Dr. Fatoki noted that Locke was eating well, was experiencing only a little gas and stomachache, and did not require emergency care. After the assessment, Dr. Fatoki placed Locke on observation status and provided him with materials to collect a stool sample.

The Court cannot say that Dr. Fatoki's treatment decisions "represent[] so significant a departure from accepted professional standards or practices that it calls into question whether the [medical professional] was actually exercising his professional judgment," *id.* (citing *Roe v. Elyea*, 631 F.3d 843, 857 (7th Cir. 2011) and *Sain v. Wood*, 512 F.3d 886, 895 (7th Cir. 2008)). The plaintiff has simply failed to provide any evidence that at the time he saw Dr. Fatoki, he required emergency or any other specific type of treatment.

Thus, the Court finds that Dr. Fatoki is entitled to summary judgment as a matter of law because there is no evidence in the record of deliberate indifference to a serious medical need.

### 3.2.4 Defendant Dodge County

Dodge County also maintains that it is entitled to summary judgment on Locke's deliberate indifference claim. Locke alleges that Dodge County

had an unconstitutional policy or practice with respect to the authority to seek emergency care; specifically, Locke alleges that nurses who cared for him told him he was unable to go to the emergency room because only a doctor had the authority to send him and that no doctors were present at the jail during that time.

The Supreme Court determined in *Monell v. Dep't of Social Servs.*, 436 U.S. 658 (1978), that a government entity is only liable under § 1983 when execution of a government policy or custom "by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy" inflicts the injury of which the plaintiff complains. *Id.* at 694. As the Seventh Circuit has stated,

> Unconstitutional policies or customs take three forms: (1) an express policy that causes a constitutional deprivation when enforced; (2) a widespread practice, that, although unauthorized, is so permanent and well-settled that it constitutes a "custom or usage" with the force of law; or (3) an allegation that a person with final policymaking authority caused the injury.

*Chortek v. City of Milwaukee,* 356 F.3d 740, 748 (7th Cir. 2004) (citing *Rasche v. Vill. of Beecher*, 336 F.3d 588, 597 (7th Cir. 2003)).

Here, as the Court has stated above, there is no evidence that Locke's constitutional rights were violated by any defendants. As such, Dodge County cannot be liable for damages because there is no underlying constitutional violation. *Pyles* 771 F.3d at 412 (citing *City of Los Angeles v. Heller*, 475 U.S. 796, 799 (1986) (per curiam) ("Finally, Wexford cannot be held liable for damages because there is no underlying constitutional violation."); *see also Ray v. Wexford Health Sources, Inc.,* 706 F.3d 864, 866 (7th Cir.2013) (inmate failed to establish a constitutional problem with his medical

treatment "and thus did not suffer actionable injury from the policy he attributes" to Wexford).

The Court also notes that Locke has failed to provide any evidence, other than his own testimony, of an unconstitutional policy. Because there is no underlying constitutional violation, however, the Court need not address this, or Dodge County's argument related to the exhaustion of administrative remedies.

Accordingly, the Court will grant Dodge County's motion for summary judgment.

4. CONCLUSION

In sum, the Court will grant summary judgment for all the defendants and finds that: (1) Defendants Ritter, Duckett, and Dr. Fatoki did not act with deliberate indifference to Locke's serious medical need; and (2) Defendant Dodge County cannot be liable for an unconstitutional policy because there are no underlying constitutional claims.

Accordingly,

IT IS ORDERED that the defendants' motions for summary judgment (Docket #75, #83) be and the same are hereby GRANTED, as more fully described in detail above, and that this action be and the same is hereby DISMISSED on the merits.

The Clerk is directed to enter judgment accordingly.

Dated at Milwaukee, Wisconsin, this 29th day of September, 2015.

BY THE COURT:

J.P. Stadtmueller
U.S. District Judge